PER CURIAM.
 

 This case is before the Court on appeal from a judgment of first-degree murder and a sentence of death as well as convictions for a number of other offenses. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we affirm both the convictions and the death sentence.
 

 
 *479
 
 FACTUAL AND PROCEDURAL HISTORY
 

 In December 2000, Corey “Bubba” Smith and seven other individuals were indicted by a Miami-Dade County grand jury in a seventeen-count indictment for crimes committed in connection with the John Doe organization. Smith was alleged to be the leader of the group and named in fourteen counts of the indictment, including conspiracy to engage in a criminal enterprise, engaging in a criminal enterprise, conspiracy to traffic in marijuana, conspiracy to traffic in cocaine, five counts of first-degree murder for the deaths of Leon Hadley, Cynthia Brown, Jackie Pope, Angel Wilson, and Melvin Lipscomb, four counts of conspiracy to commit murder, and second-degree murder for the death of Marlon Beneby.
 

 The John Doe organization had been the subject of a joint state and federal task force.
 
 [1]
 
 The task force surveillance included pen registers on several phones, followed by wiretaps on the phones of Smith and his second-in-command, Latravis Gal-lashaw. The wiretaps recorded calls on Gallashaw’s cell phone (which was registered to Smith) and Smith’s landline at his residence. These wiretap recordings and transcripts of the recordings were admitted into evidence at Smith’s trial.
 

 The state criminal conspiracy count was based on the operation of the John Doe organization, a criminal enterprise that processed, packaged, and distributed powder and crack cocaine and marijuana in the Liberty City area of Miami-Dade County over a six-year period from July 1994 through January 1999. At its peak, the John Doe organization operated seven “holes,” locations where they distributed drugs. The holes had two different names, John Doe and No Fear, to keep people from knowing that all of them belonged to one organization. The group also packaged their drugs in different colored bags to confuse the police and others about the extent of the John Doe enterprise.
 

 Smith’s trial took place in October 2005, with jury selection and the guilt phase of trial lasting over thirty days. The State called eighty-four witnesses. The defense called one witness, the attorney who had represented Smith on a previous first-degree murder charge in the death of Dominique Johnson. Smith did not testify.
 

 The court ordered additional courtroom security for the trial, including a second magnetometer (metal detector) on the seventh floor of the courthouse and required potential jurors, attorneys, and spectators to pass through the magnetometer before entering the courtroom. Two armed police officers searched all individuals, including jurors, who entered the hallway outside the courtroom. Multiple armed police officers were stationed inside and outside the courtroom. Smith was required to wear a stun belt. Spectators had to present photo identification before being admitted to the courtroom.
 

 During jury selection, Smith’s mother Willie Mae Smith was asked to leave the courtroom when the rule was invoked. When the mother passed the seventy potential jurors assembled in the hallway she said, “God bless you and have a blessed day.” When this remark was reported to the court the next day, the judge questioned the jurors about the mother’s comment and whether it would have an effect on their ability to be fair to Corey Smith. Many of the venire members did not hear
 
 *480
 
 the comment at all. Of those who did hear it, only a few expressed any concerns about the comment or felt it would affect their decision-making. In light of these responses by the venire, the court denied the defense’s motion to have the panel stricken. The court entered a written order that Smith’s mother was not to have contact with the jurors, not to enter the building unless called as a witness, and not to come within 1000 feet of the building.
 

 The State’s witnesses during the guilt phase of trial fell into three categories: (1) professional witnesses such as police officers and investigators, crime scene technicians, medical examiners, and forensic experts; (2) witnesses who provided legal identification of the homicide victims or who had personal knowledge of the circumstances surrounding the various homicides and acts of violence; and (3) members of the John Doe organization or Smith’s associates who connected him to the homicides and the drug enterprise. Because Smith’s trial involved a number of separate charges, the facts regarding each will be discussed separately below, including the facts pertinent to Smith’s appellate claims. These facts were developed through witness testimony and evidence presented at trial.
 

 Drug Enterprise and Organization
 

 A number of witnesses who had been involved in John Doe testified about the organization and operation of the seven drug holes. According to their testimony, Smith was the head of John Doe, Latravis Gallashaw was the second-in-command, and Julian Mitchell was the third. Smith started out as a member of the Lynch Mob, a drug group that predated John Doe in the same neighborhood. The leader of this group was Mark Roundtree, who had both a friend and mentor relationship with Smith. Smith opened his own drug hole across the street from his mother’s house on Northwest 58th Street and 15th Avenue in 1994. Smith engaged in intimidation and violence to take over other drug spots or to run competitors out of business.
 

 Each drug hole employed a number of workers, including a “bombman” who sold the drugs, a “watchout” who looked out for the police and marketed the drugs by yelling slogans to potential customers, a “gunman” who kept the peace and enforced the rules, and a “street lieutenant” who dropped off drugs and collected money. In addition, John Doe also employed “ta-blemen” who processed and packaged the drugs for street sale, “turnover lieutenants” who tracked the money to provide a count for paying the workers, and “enforcers” or “hit men” who carried out the group’s violence. The employees worked regular shifts at their jobs and were paid in cash by the lieutenants.
 

 Various witnesses and documentary evidence also revealed a type of accounting system through tally sheets which enabled John Doe to keep track of how much and what kind of drugs were sold and how much money was collected and paid out. Letter codes were used to indicate the type of drug and the size of the bags. Witnesses also testified that workers at the drug holes were permitted to buy guns that they might be offered by individuals and pay for them with John Doe money. The guns were kept by the workers at the holes. However, the workers had to get special permission to buy machine guns, which were stashed in a special location and not kept by the general drug hole workers.
 

 When a drug unit officer attempted to conduct a controlled buy at the residence of Antonio Allen in September 1998, Allen was alerted when the officer’s radio made a transmission. Allen was arrested with over 500 bags of cocaine, a .380-caliber
 
 *481
 
 semiautomatic gun with a four-inch barrel, and $922 in cash. Allen admitted the possession of these items. In September 1998, the wiretap revealed that a sack of narcotics was going to be delivered to the residence of Charles Clark. The search produced over 100 bags of crack cocaine, $846 in cash, two handguns and ammunition, and rubber bands for bundling cash. The task force executed search warrants for various residences of John Doe members in late October and early November of 1998. The search of Smith’s mother’s residence revealed two homemade grenades in the attic, a 9-millimeter pistol in Smith’s room, various boxes of ammunition, magazines, and clips, a bullet-proof vest, a loaded derringer in the mother’s bedroom along with $850, drug residue in the kitchen, and a copy of the police report in the Johnson case in the nightstand of Smith’s bedroom. The search of the home of Todra Smith and William Austin, Smith’s sister and brother-in-law, uncovered several bricks of marijuana, hundreds of small bags of marijuana, a loaded 9-millimeter semiautomatic pistol, a ,25-cali-ber pistol and magazine, and a variety of drug paraphernalia. The search of Latra-vis Gallashaw’s house uncovered various paraphernalia for processing and packaging cocaine, including scales and thousands of empty bags for packaging, tally sheets of packaging and sales, two bricks of marijuana, rock and powder cocaine, empty kilo wrappers in the garbage, and $16,000 in cash. The search of the residence that Smith shared with his girlfriend Crystal Boyd uncovered a radio frequency detector to detect bugs or wires, a phone guard that was supposed to detect wiretaps, a diamond-studded Rolex watch, $500 in cash in Smith’s shorts pocket, a bag containing $185,724 in cash bundled with rubber bands, an AK-47 drum that can hold up to 75 rounds of ammunition, and a small amount of marijuana. In November 1998, a search of the Steady Mobbin’ Car Wash
 
 [2]
 
 on Northwest 17th Avenue uncovered a number of weapons in a locked storage room, including a .357 handgun, a Mac-10 semiautomatic handgun, a Rueger Mini-14 rifle, and a Mac-90 rifle. There was also a ski hat in the storage room.
 

 On December 11, 1998, the John Doe “hitmen” Jean Henry, Julius Stevens, and Eric Stokes did a drive-by shooting of the Northwest 98th Street residence of Patricia Harvey, who is related to Anthony Fail. There were a number of adults and children at the residence that day, as they were celebrating the “Soul Bowl” football game between Miami Northwest High School and Jackson High School. There were thirty-seven bullet holes in the front of the Harvey house and other bullets struck the trees in front of the house. Two of the bullets actually went through the Harvey house and struck a duplex behind it.
 

 Based on this shooting, the crime suppression team of the Metro Dade police conducted surveillance of the residence of Eric Stokes and Jean Henry at 1255 Northwest 100th Terrace. The officers observed black males getting into two different vehicles at this location. The officers observed that the individuals in each ear were armed. A white station wagon containing Julian Mitchell and Eddie Harris traveled to the west and led the officers on a high-speed chase for about ten minutes. The officers observed items being thrown from the vehicle. The chase ended at a Costco Warehouse approximately sixty blocks away. Eric Stokes, Jean Henry,
 
 *482
 
 and Julius Stevens left in a blue LeSabre and fled at a high speed. The three men abandoned their vehicle and then fled on foot. The police officers were able to arrest them after being alerted by a resident on 74th Street that the men were running through his house. The police found a loaded .44-caliber Colt pistol in a holster and a blue Dickie shirt that had been dumped over a fence as the men fled on foot. The police got court authorization for a search of the house on Northwest 100th Terrace. In Stokes’ bedroom, the police found a 9-millimeter assault rifle and a bullet-proof vest. In Stevens’ bedroom, they found a total of $23,000 in cash and ammunition. A small amount of marijuana debris was found in the kitchen and living room. Numerous boxes of ammunition of different calibers were found in a garbage can.
 

 In January 1999, the task force executed warrants for the residences of Julius Stevens and Ketrick Majors. In Stevens house, the search uncovered a number of boxes of ammunition and loose rounds, tally sheets, a triple-beam scale, a bulletproof vest, a ski mask, and small bags of cocaine. In Major’s house, the search uncovered empty bags for packaging drugs, an AK-47 magazine and clip, six boxes of ammunition, a box of .22-caliber long rifle rounds, and a ski mask.
 

 Leon Hadley Murder
 

 Testimony showed that Leon Hadley was shot and killed on the -morning of August 21, 1995, outside a store on the corner of 14th Avenue and 61st Street in Miami-Dade County. Hadley suffered six gunshot wounds, with a fatal wound to his head. His wounds did not show stippling that would indicate that he was not shot at a close distance. Eleven shell casings and one live round were found at the murder scene. Hadley had a preexisting gunshot wound to his right
 
 leg
 
 and had a cast on his leg. Based on witness statements, a BOLO issued for a dark, late model vehicle with a black male driver.
 

 Various witnesses testified about the relationship between the defendant Smith and Hadley and what they knew about Hadley’s murder. These witnesses included Julian Mitchell, Carlos Reynolds, Phil White, Eric Mitchell, Anthony Fail, Antonio Allen, and Herbert Daniels, all members of John Doe, and Smith’s girlfriend Tricia Geter. Hadley had been an enforcer for a drug organization that predated John Doe. Hadley’s younger brother Eric operated a drug hole just around the corner from the first drug hole that Smith opened. Smith was concerned that Eric was “short stopping” potential customers, i.e., taking customers away from the John Doe hole. Smith forced Erie to close his hole. Hadley confronted the members of the Lynch Mob about this situation and it appeared to be resolved.
 

 However, a short time later Hadley got into a fight with Keevon Rolle at a Lynch Mob birthday celebration in the neighborhood. When Hadley pursued Rolle as he left the area of the fight, Rolle pulled out a gun and shot Hadley in the leg. A few days later, Hadley confronted members of the Lynch Mob who were sitting on the corner of Northwest 61st Street and 14th Avenue outside the store. Hadley warned them not to sit there when his leg healed because he planned to “spray up the corner” and kill Lynch Mob members. Shortly after this, Smith and two other individuals were spotted walking through an alley in the area one night and wearing all black clothes, which was indicative of “going to war” or going to kill someone.
 

 Phil White testified that he witnessed Smith and Kelvin Cook shoot Hadley. Smith had shown up at White’s house early on the morning of Hadley’s shooting. Smith was driving a dark burgundy Delta
 
 *483
 
 88. Smith and Cook were both dressed in black and had black ski masks or “scul-lies.” Smith had an Uzi-type gun and Cook had an AK-47 rifle. Smith enlisted White to help him find Hadley. Smith stated that he had a dream that Hadley had killed him. The trio drove around for thirty to forty-five minutes before they spotted Hadley on the corner at the store. Smith stated his intent to kill Hadley and changed seats with White in the car. White was actually driving the vehicle when the shooting took place. White observed Smith put on a ski mask, jump out of the car, and shoot Hadley. When Smith’s gun jammed, Cook began shooting. After the shooting, the trio picked up Smith’s car and drove both vehicles to a warehouse. They wiped down the vehicle used in the shooting and removed its tag.
 

 Trida Geter also testified about the bad blood between Hadley and Smith. Smith told Geter that Hadley had threatened to kill him and that he was going to kill Hadley first. Smith left Geter’s house early in the morning on the day that Had-ley was killed. When Smith returned, he appeared nervous and had abrasions on his knee and elbow. He told Geter that he “did it” and described how his gun had jammed during the shooting. Geter testified that Smith called his mother and Roundtree to tell them about the shooting as well. Geter stated that Smith was “well-feared” after killing Hadley and took over the area that had been controlled by Hadley. Geter also testified that she had been approached by Smith before the instant trial. Smith wanted Geter to testify that he had been home with her on the morning that Hadley was shot. Anthony Fail also testified that Smith felt threatened by Hadley and had admitted that he had killed Hadley along with Cook and that White was the driver of the car.
 

 Mark Roundtree had previously been convicted for Hadley’s murder and sentenced to life. Various individuals testified that they either saw Smith make payments to Roundtree’s family on a weekly basis after he was arrested or they were ordered to give money to Roundtree’s family when the family came to the drug holes. Herbert Daniels overheard Smith and Roundtree talking about Hadley’s murder at one point. Smith told Roundtree, “You didn’t do it; why are you worried?” Antonio Allen testified that Smith told him that Roundtree took the blame for Hadley’s murder. Tricia Geter testified that Smith paid for Roundtree’s attorney and sent his mother Willie Mae Smith to the trial to bring back reports about the proceeding. Anthony Fail testified that Smith stated that Roundtree had nothing to do with Hadley’s murder.
 

 Roundtree gave inconsistent statements about his involvement in Hadley’s shooting. In a statement made in April 1996, Roundtree totally denied any involvement. However, the polygraph operator noted deception in Roundtree’s negative response to the question, “Do you know who shot Hadley?” Sometime during the investigation of John Doe, Detective Frank Alphonso learned that Roundtree might be innocent of Hadley’s murder and interviewed him about the incident in December 2000. The sole witness against Roundtree also recanted her trial testimony that Roundtree had shot Hadley.
 

 After Roundtree had exhausted all appeal and postconviction proceedings regarding his conviction for Hadley’s murder, Roundtree gave another statement in January 2001. Roundtree stated that Smith told him that Smith, Cook, and White were in the car together, and had shot Hadley. After having a brief discussion with Detective Alphonso, Roundtree amended his statement and said that he
 
 *484
 
 had also been in the car and had shot Hadley with an AK-47, which was consistent with the forensic evidence about the shooting.
 

 In July 2004, Roundtree apparently changed his story again. This statement is the subject of one of Smith’s claims on appeal and will be discussed more fully in the analysis of that issue below. This time Roundtree stated that he had not been in the car and had not shot Hadley. He explained that he made this up to make himself a better witness for the State at Smith’s trial in hopes of receiving a reduced sentence in exchange for his testimony. Pursuant to a postconviction motion, Roundtree’s murder conviction and sentence were vacated in December 2004. Roundtree pled guilty to conspiracy to commit Hadley’s murder, based on his admission that he tried to locate Hadley for Smith. Roundtree was sentenced to nine years in prison, with credit for time served, and was released.
 

 Jackie Pope Murder
 

 Jackie Pope, a thirty-six-year-old deaf man who served as a watch out for John Doe, was shot to death because he gave a deposition about the New Year’s Eve 1997 shooting of Miami police officer Ricky Taylor. Various witnesses testified that lots of people in the neighborhood were shooting their guns in celebration of the new year. Taylor was the passenger in a marked police vehicle that was patrolling the neighborhood. He was shot from a third floor balcony of an apartment building at 1370 Northwest 61st Street, which was one of the John Doe drug hole locations known as the “dormitories.” Officer Taylor had a penetrating wound to the left side of his head at the hairline, but survived the shooting. The crime scene technician recovered hundreds of casings from the scene. Charlie Brown, a member of John Doe, was identified as the individual who shot Officer Taylor. Brown pled guilty to the shooting and was sentenced to thirty years in prison.
 

 Jackie Pope was shot sixteen times after midnight on March 31, 1998, in the vicinity of 14th Avenue and 62nd Street. A firearms expert from the Miami-Dade Police Department testified that the casings from the scene and projectiles from the body indicated that Pope had been shot by two guns. The medical examiner testified that three of the gunshot wounds to Pope’s torso were lethal because they did extensive damage to his organs, including his lungs, heart, spleen, liver, left kidney, and intestines. There was no stippling of the wounds that would indicate Pope was shot from a close range.
 

 Carlos Walker testified that he found out that Jackie Pope was a witness against Charlie Brown several weeks before Pope was shot. Smith showed Walker Pope’s deposition, in which Pope stated that he saw Brown shooting from the third floor of the building when Officer Taylor was shot. Walker described Smith as being very angry about Pope’s deposition. Trida Geter testified that Smith told her that Brown had shot the police officer on New Year’s Eve. She also said Smith told Brown to turn himself in because the police kept hitting the John Doe holes in search of Brown and it was hurting business. Smith promised to get an attorney for Brown. Anthony Fail testified that Smith discussed Brown’s case with him and told him about a deposition in which Jackie Pope “snitched” on Brown. Fail testified that Smith offered him $25,000 to kill Pope. Charles Clark testified that he saw Pope shortly before he was shot. Clark also saw several of the John Doe hitmen in the same vicinity, including Eric Stokes, Jean Henry and Julius Stevens. Clark then saw Pope being summoned to the alley where the hitmen were sitting. A short
 
 *485
 
 time later he heard a series of shots from the alley. Later, Clark saw Pope’s body in that same area. At the penalty phase of trial, Detective Alphonso testified that Julius Stevens had admitted that he and Eric Stokes shot Jackie Pope. Stevens had also stated that he shot Pope because Smith ordered him to shoot him because Pope had served as a witness on Charlie Brown’s case.
 

 Cynthia Brown Murder
 

 Cynthia Brown died from asphyxia after being smothered by a pillow in a room at the Tradewinds Motel at 4525 Southwest 8th Street. Brown checked into the hotel with her boyfriend Chazre Davis on the evening of July 23, 1998, and her body was found at midday the next day. Brown’s and Davis’s prints were found on a mirror in the motel room.
 

 The medical examiner testified that Brown had petechial hemorrhages in her eyes, inside her upper lip, and on her epiglottis. Brown had small abrasions under her left nostril and on her upper lip. Her lungs were full of fluid due to pulmonary edema. She also had postmortem cuts on the left side of her neck. The bed pillow had small smears of blood on the right side from Brown’s face, which was consistent with the small abrasions on her face. The medical examiner stated that all of these findings were consistent with death from asphyxia caused by being smothered with the bed pillow. Toxicology showed that Brown had both cocaine and alcohol in her body at the time of death. However, both the medical examiner and the forensic toxicologist testified that the levels were not life-threatening and Brown did not die from an overdose.
 

 During cross-examination, the defense asked the medical examiner about autoer-otic asphyxia and if the victim could have died from this rather than being smothered by a pillow. When the defense asked the medical examiner to explain autoerotic asphyxia, the State objected and the court sustained that objection. The court ruled that the defense could ask the medical examiner if it applied in this case, but would have to call its own expert to explain this. The medical examiner opined that it was possible but unlikely that the victim in this case died during a sex act. The defense’s inability to question the medical examiner more thoroughly on this topic is one of Smith’s claims in this appeal. The legal propriety of this limitation will be discussed in the analysis of that issue below.
 

 Brown was the sole witness against Smith in the murder of Dominique Johnson, a nineteen-year-old drug seller who was shot to death in the early morning hours of November 7, 1996, at Northwest 12th Parkway and 62nd Street. Johnson was shot twice in his arms and once through his temple. The gun was one to three inches away when Johnson was shot in the head. Johnson was transported from the scene and pronounced dead at the hospital. No gunshot residue was found on Johnson’s hands, indicating that he did not fire a gun. While several people apparently witnessed Johnson’s shooting, only Cynthia Brown came forward and identified Smith to the police.
 

 Smith was scheduled to be tried for Johnson’s murder on July 28, 1997. David Waksman, the prosecutor in Johnson’s case, testified in the instant trial that he had to dismiss the charges against Smith when Brown was discovered dead less than a week before the Johnson trial. Waksman testified that Brown was the State’s sole witness in the Johnson case.
 

 At Smith’s trial in the instant case, Shaundreka Anderson, who worked with Johnson at a rival drug hole, testified that she saw Smith and Johnson arguing over money earlier in the day on which Johnson
 
 *486
 
 was shot. Smith approached Anderson that night and wanted to know where Johnson was. Smith had a Glock 9 gun in his hand. Smith entered the drug hole where Johnson was located and Anderson heard shots. Anderson found Johnson after he was shot. At the scene, Cynthia Brown told Anderson that she knew who killed Johnson because she had been standing behind a pole when it occurred. Anderson told Brown to mind her own business and advised her not to talk. Anderson testified that she was approached by a number of individuals who said that Smith wanted to see her. Smith offered her $2500 to help him. A few days later, Anderson gave a statement to the police in which she falsely identified another individual as Johnson’s shooter. Anderson was so fearful for her safety that she cut off her dreadlocks and shaved her head as a disguise. She also left the area.
 

 Demetrius Jones testified that he overheard a heated argument between Smith and Johnson and looked out of his bedroom window to see Smith pull a gun out of his waistband. Jones heard multiple shots and saw Johnson on the ground. Within seconds Brown approached him and said she saw who shot Johnson. Jones also advised Brown to keep silent for her safety. Neither Jones nor Anderson remained at the scene to talk to the police, but Brown did. After Smith was charged with Johnson’s murder, Jones agreed to “help” Smith with his case and gave a deposition to the state attorney in which he lied about Smith’s involvement. Jones also admitted that he lied to Smith’s defense attorney about the Johnson murder. After Jones gave his deposition and Smith was awaiting trial, Jones did not have to work and was given money from the drug holes.
 

 Several witnesses testified that Smith wanted to get rid of the only witness who was going to testify against him in the Johnson murder case. Anthony Fail overheard a conversation between Smith and his mother about how to kill a woman without shooting her. They discussed poison and strangulation. Fail also testified that Smith offered him $50,000 to kill Brown. However, Smith was adamant that he did not want Brown shot and that he did not want the evidence leading back to him. Smith told Fail that the “junkie bitch had to go,” referring to Brown. Fail did not agree to kill Brown because of this limitation and because he was on house arrest and could not move freely about the community. Fail testified that Smith put aside $20,000 to pay Brown’s boyfriend for killing her. Herbert Daniels overheard a conversation between Smith and Brown’s boyfriend Davis shortly before Brown was killed. Daniels heard Davis ask Smith what he wanted him to do about Brown.
 

 Carlos Walker testified that Smith talked to him about Brown “snitching” on him. Smith claims that there was a discovery violation by the State relating to Walker’s testimony. This is discussed in more detail below. Smith told Walker that Brown had to “come up dead for him to win his trial.” Walker also heard Smith telling Davis to either suffocate or strangle Brown because he did not want bullets, casings, or other evidence at the scene. Walker admitted that he lied to both Smith’s defense attorney and the prosecutors at his deposition when he said that Smith never discussed the Johnson case with him. Walker said he lied out of fear for his life. He said “look what happened to Jackie Pope.”
 

 Tricia Geter testified that Demetrius Jones had been paid by Smith’s friend Peggy King to testify on Smith’s behalf at the Johnson murder. Geter also testified that Smith asked her if she could obtain pure heroin that could be given to Brown
 
 *487
 
 to kill her. Smith stated that he was going to take Brown’s life because she was trying to take his.
 

 After Brown was killed, Smith told Julian Mitchell that he had to have her killed in order to win his case and now they “wouldn’t be able to take him.” The day after the Johnson case was dismissed, Walker heard Smith say that the State could not hold him and that Davis had handled his business. Geter testified that she saw Davis seeking payment from Smith after Brown was killed.
 

 Detective Alphonso testified that he discovered a copy of a deposition and the police report from the Johnson case in the nightstand of Smith’s bedroom when he executed a search warrant based on the John Doe investigation. The police report was introduced to prove Smith’s knowledge that Brown was the witness against him and his motive for wanting her killed. The trial court denied the defense’s hearsay objection to the admission of the report, finding that the report was not admitted to prove the truth of the matter asserted in it, i.e., that Smith shot Johnson. However, the court did agree to redact certain parts of the report. The defense originally refused the court’s offer of a limiting instruction to explain how the jury should consider the report. Five days later, the defense asked the court for a limiting instruction and asked that the whole report, rather than the redacted version, be admitted. There was a sidebar discussion of the wording of the limiting instruction and the jury was instructed. The admission of the police report is one of Smith’s claims on appeal. The nature of the report and the instruction given is more fully discussed in the analysis of that issue below.
 

 Angel Wilson Murder
 

 Angel Wilson was shot multiple times with a semiautomatic assault rifle while she was driving her car down 69th Street in the early morning hours of December 1, 1998. A witness saw someone in a dark older model car with tinted windows pull up beside Wilson’s vehicle and heard multiple shots. A number of witnesses saw or heard the dark vehicle speeding away from the shooting. Witnesses also heard a series of multiple shots in rapid succession. Seventeen shell casings were recovered from the scene. The bullets entered the driver’s side of the vehicle and struck Wilson sixteen times. Six of these wounds were fatal. The bullet wounds also caused extensive tissue damage, ripping off Wilson’s left breast and part of her ankle. She was also struck by metal fragments as the bullets pierced her vehicle. She died on the scene from massive internal injuries. The medical examiner testified that Wilson’s lungs were “peppered” with pieces of the projectiles that fragmented in her body. A home in the vicinity was also struck by bullets that pierced the front door and struck an inside wall.
 

 Wilson was not the intended victim of this shooting. Her boyfriend Anthony Fail was being sought by members of John Doe who intended to kill him. Wilson and Fail were together in Wilson’s car just before the shooting when they arrived at the home of Fail’s stepbrother James Harvey. Harvey testified that on the night of Wilson’s murder a car occupied by John Doe members Julius Stevens, Eric Stokes, Jean Henry, and “Eddie Bow”
 
 [3]
 
 drove by his residence ten or eleven times. When Fail and Wilson arrived at Harvey’s house, Harvey warned them about the car. Fail sent Wilson home because he feared for her safety. Fail learned the next morning that Wilson had been shot to death. At
 
 *488
 
 the penalty phase of trial, Detective Alphonso testified that Julius Stevens admitted that he and Eddie Harris had shot Wilson.
 

 Carlos Walker testified that Eddie Harris borrowed his Grand Marquis on the day of Wilson’s murder. The car was returned by Harris and Eric Stokes the next day and they warned Walker that he should “lay low” with this car. Shots were fired at Walker the next time he drove his car and his toe was blown off.
 

 Various witnesses described the history between Fail and John Doe that led to these events. Fail testified that he met Smith in 1996 after Fail was released from prison. Smith had taken over Fail’s drug hole on 61st Street during Fail’s incarceration. Initially, Smith and Fail worked out an arrangement about the drug hole — Fail would receive money from the operation of the hole and was given permission to get drugs and money from the hole. However, this arrangement ended when Smith ordered John Doe workers to cut Fail off. Fail had heated arguments with both La-travis Gallashaw and Smith about being cut off. Fail responded by robbing John Doe holes and shooting at the holes. Fail and his friends were also shot at by John Doe members.
 

 Julian Mitchell, Charles Clark, Eric Mitchell, Antonio Allen, Tricia Geter, and Herbert Daniels each related the same account of a falling out between Smith and Fail over money, which resulted in Fail robbing the John Doe holes. Mitchell was given instructions to watch out for Fail and to kill him. Daniels was instructed to look for Fail and actually rode up and down the block looking for Fail on the day Wilson was killed. Mitchell was instructed by Smith and others to shoot Fail on sight. Allen heard Smith discuss the Fail problem with Julius Stevens at the Steady Mobbin’ Car Wash. Geter heard Smith instruct Stevens to deal with Fail because he had been robbing his drug holes. According to Mitchell, the shooters were amused by a television report on the morning after Wilson’s murder that named Fail as a suspect in her shooting.
 

 Mitchell and Fail also described a shooting that occurred outside the Foxy Lady Club at 79th Street and 17th Place in June 1998. In a purported gesture to end the dispute with Fail and his friends, Galla-shaw gave Fail money to go out clubbing. Fail and his friends ended up at the Foxy Lady Club that night. While they were leaving the club, someone began shooting at them. Fail’s companion Kenwan Maynard was killed. Mitchell testified that he drove a number of John Doe individuals to a night club where Fail had been spotted. These individuals had machine guns and opened fire on someone outside the club. Maynard had seven gunshot wounds from a high-velocity weapon. Police recovered multiple casings from semiautomatic assault rifles. Based on eyewitnesses to the shooting, the police put out a BOLO for a large dark four-door vehicle with three males in ski masks and armed with weapons. The State filed a
 
 Williams
 
 rule
 
 [4]
 
 notice about the Foxy Lady Club shooting. The evidence was introduced to prove that John Doe was looking for Fail and intended to shoot him.
 

 Melvin Lipscomb Manslaughter
 

 Melvin Lipscomb, a twenty-two-year-old customer of John Doe, was killed in the early morning hours of August 27, 1996, at 1527 Northwest 58th Street. The testimony showed that Lipscomb sustained eleven gunshot wounds, including three fatal shots to the head and one to his chest. At least one of the head wounds was at close
 
 *489
 
 range. Lipscomb also had scrapes on the right side of the face, right elbow, and right knee, indicative of falling to the pavement. Lipscomb was found face down on the pavement. Toxicology reports indicated that Lipscomb had alcohol and cocaine in his system at the time he was shot.
 

 Various witnesses testified that Lipscomb was standing in line at the 58th Street drug hole, across the street from Smith’s mother’s house. Lipscomb apparently broke the drug hole rules by talking loudly. He also got into an argument with Antonio Godfrey, who was a gunman at this drug hole. Godfrey fired his gun at Lipscomb and chased him down the stairs and across the street. Julian Mitchell testified that he was the lieutenant at the hole the night that Lipscomb was killed. Mitchell saw Godfrey chasing Lipscomb and saw him shoot Lipscomb in Smith’s yard across the street from the drug hole. He also testified that Smith advised God-frey to lie low in order to avoid the police. Trida Geter testified that Smith told her about Lipscomb’s murder. Smith heard someone calling his name and pleading outside his house. When Smith came outside, his workers told him that Lipscomb had “disrespected the hole.” Smith responded to “do his ass” and Godfrey shot him.
 

 Marlon Beneby Manslaughter
 

 Marlon Beneby died in the hospital on August 21, 1998, from complications of a gunshot wound to his upper back on July 23, 1998. Beneby was shot once in the back, and the bullet lodged in the fourth and fifth cervical vertebrae, causing him to become a quadriplegic. When Beneby arrived at the hospital he was able to communicate, but unable to move. He also had abrasions and some blunt force injuries. Necrosis spread from his spinal cord to his brainstem and he lost the ability to breathe in the first week after the shooting. He developed severe bronchitis in his lungs.
 

 Beneby worked as a “bombman” for John Doe. Herbert Daniels, Eric Mitchell, Carlos Walker, Antonio Allen, and Danny Dunston all testified that Beneby was suspected of selling his own drugs at the John Doe hole. When confronted about this, Beneby blamed the tablemen Dunston and Jeffrey Bullard for supplying these drugs. When Latravis Gallashaw found out that Beneby was “stealing from the table” by selling his own drugs at the John Dole hole, he shot Beneby. Walker testified that he saw the argument between Beneby and Gallashaw on the night of the shooting. Walker heard a shot, saw Beneby on the ground, and saw Gallashaw hide a gun in his waistband. After the shooting, Walker heard Beneby say, “I know I was wrong for what I did. I don’t want to die.” Tyree Lampley, who was not a member of John Doe, saw Gallashaw shoot Beneby with a 9-millimeter gun. Allen testified that he heard the shot as he was riding up on his bicycle and then saw Beneby on the ground. Allen also admitted that he helped move Beneby from the front yard of the house to the sidewalk and helped clean up the blood in the yard. The John Doe members who were present agreed to act as if Beneby had been riding Allen’s bike when he was shot in a drive-by. The officers and emergency personnel who responded to the shooting testified that it appeared as if someone had tried to wash away blood from the scene.
 

 Charles Clark testified that Gallashaw admitted to him that he had shot Beneby. Mitchell also testified that during the time that Beneby was in the hospital Gallashaw attempted to pay Beneby to be quiet about the shooting.
 

 Smith was convicted of the first-degree murders of Hadley, Pope, Brown, and Wilson; four counts of conspiracy to commit
 
 *490
 
 murder (Hadley, Brown, Pope, and Fail), two counts of manslaughter (Lipscomb and Beneby), RICO conspiracy, racketeering, and conspiracy to traffic cocaine and cannabis.
 

 A motion hearing was conducted on February 7, 2005, at which the court considered the defense’s motion for a new trial, various motions in limine, and challenges to the death penalty and death penalty instructions. As a basis for its motion for a new trial, the defense raised an issue relating to the State’s alleged nondisclosure of Mark Roundtree’s July 2004 statement in which he stated that he had previously implicated himself in the Hadley murder so that he could be a witness against Smith at this trial. Smith raises this as a claim in his appeal. It is discussed in more detail in the analysis of that issue below. The State explained that it had no report of a July statement by Roundtree, that Roundtree had given a number of inconsistent statements to the police and the defense was aware of these statements, that Roundtree had not been called as a witness and did not provide any evidence that was relied upon to prove Smith’s participation in Hadley’s murder, and that the defense had informed the jury at trial that Roundtree had been convicted of Hadley’s murder. The court denied the defense’s motion for a new trial. The court granted the State a protective order to prohibit the defense from asking
 
 why
 
 the prosecutors had not filed charges against State witnesses who had admitted their involvement in a number of murders. The court ruled that the defense was free to ask
 
 whether
 
 charges had been filed and to argue this as a mitigating factor to the jury.
 

 The penalty phase took place in February 2005 and lasted three days. The State presented several family members who either read or made victim impact statements. The medical examiner who examined the body of Cynthia Brown testified about the process of asphyxiation by smothering. The State also asked the court to take judicial notice of Smith’s contemporaneous convictions for violent felonies in this case. The defense presented testimony from Smith’s attorney in the federal conviction, the testimony of several State witnesses who had admitted their participation in murders, Detective Alphonso, who testified about Julius Stevens’ admissions to the Pope and Wilson murders, the defendant’s mother, Willie Mae Smith, who testified about the violent deaths and injuries that had occurred in Smith’s life, and the individual who took the various sworn statements of Roundtree about the Hadley murder. The State presented Detective Alphonso and Trieia Get-er as rebuttal witnesses.
 

 The jury recommended life sentences for the murders of Hadley and Pope and death sentences for the murder of Brown by a vote of ten to two and the murder of Wilson by a vote of nine to three.
 

 No additional evidence or argument was presented through a
 
 Spencer
 
 hearing,
 
 [5]
 
 and Smith elected not to address the court. However, both sides presented written sentencing memoranda to the court. The court followed the jury’s recommendations as to sentencing, imposing life sentences for the murders of Hadley and Pope and death sentences for the murders of Brown and Wilson.
 

 In the Brown murder, the trial court found three aggravating factors: (1) Smith had a previous conviction of another capital felony or a felony involving the use of violence, based on the contemporaneous first-degree murder convictions, the man
 
 *491
 
 slaughter convictions, and the conspiracy to commit murder convictions; (2) the murder was committed to hinder or disrupt the lawful exercise of a governmental function or the enforcement of laws because Brown was killed to prevent her testimony against Smith in the Johnson murder case; and (3) the murder was cold, calculated, and premeditated (CCP). The trial court gave great weight to these aggravating factors. The sentencing order discusses three statutory mitigating factors: (1) lack of significant history of prior criminal activity; (2) extreme mental or emotional disturbance; and (3) Smith’s age at the time of the murder. However, the court assigned little weight to these statutory mitigators, explaining that there either was no evidence to support the miti-gator or the evidence presented actually refuted it.
 
 [6]
 
 The trial court also considered a number of nonstatutory mitigating factors relating to Smith’s background and family,
 
 [7]
 
 which were given little or some weight.
 

 In the Wilson murder, the trial court found three aggravating factors: (1) Smith was previously convicted of another capital felony or a felony involving the use of violence based on his contemporaneous convictions of first-degree murder, manslaughter, and conspiracy to commit murder; (2) the murder was committed for pecuniary gain based on the fact that Wilson was killed when her car was ambushed by members of the John Doe gang who were trying to kill her boyfriend Anthony Fail to protect the drug enterprise; and (3) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification, based on the careful, prearranged plan to commit this execution-style murder. The trial court assigned great weight to each of the aggravating factors. The trial court considered the same statutory mitigators as in Brown’s murder (lack of significant history of prior criminal activity, extreme mental or emotional disturbance, and the age of the defendant), but assigned them little weight for the same reasons as stated above. The trial court also found the same nonstatutory miti-gators regarding Smith’s background and family as in Brown’s murder. The trial court also considered the fact that Smith did not shoot Wilson himself and never intended for Wilson to be killed, but gave this little weight in light of the overwhelming evidence that Smith ordered the execution of Fail and Wilson was killed as a result of this plan.
 

 In both cases, the trial court found that “the aggravating circumstances clearly and convincingly outweigh the mitigating factors” and imposed death sentences for both Brown’s and Wilson’s murders. The court imposed upward departure sentences on the noncapital charges based on the following factors: Smith’s leadership role in a criminal organization; Smith had committed crimes in order to impede his
 
 *492
 
 prosecution for conduct in an underlying arrest; Smith was not amenable to rehabilitation; the murders of Wilson and Brown were CCP; and Smith had committed multiple murders and manslaughter. The court imposed consecutive thirty-year sentences for RICO conspiracy, RICO racketeering, conspiracy to traffic in marijuana, conspiracy to traffic in cocaine, and conspiracy to commit the murders of Had-ley, Brown, Pope, and Fail. The court imposed consecutive fifteen-year sentences for the manslaughter of Lipscomb and Beneby.
 

 ISSUES AND ANALYSIS
 

 In his appeal to this Court, Smith raises nine issues. He claims that (1) the security measures ordered by the trial court were prejudicial and violated his right to a fair trial; (2) the trial court erred in striking the jury panel that had been exposed to the out-of-court comment by Smith’s mother; (3) the trial court erred in permitting a member of the John Doe organization to testify about the meaning of terms in the recorded conversations; (4) the trial court erred in admitting into evidence a police report concerning the Johnson murder that was found in Smith’s bedroom; (5) the trial court erred in limiting defense cross-examination of three State witnesses; (6) the trial court erred in not granting a mistrial after the State solicited the medical examiner’s opinion on an improper hypothetical question after two defense objections to this hypothetical question had been sustained; (7) the trial court erred in denying a new trial based on the State’s failure to disclose a witness statement that was materially favorable to the defense; (8) the trial court erred in not holding a hearing to determine whether the State failed to disclose that a witness would testify inconsistently with his deposition and to determine whether the defense was prejudiced by this failure; and (9) the trial court erred in not granting a new trial based on prosecutorial misconduct. In addition to considering Smith’s arguments on appeal, this Court reviews the record to confirm that sufficient evidence supports the jury’s verdict of guilt in the first-degree murders and the proportionality of the death sentences imposed.
 
 See
 
 Fla. R.App. P. 9.142(a)(6). We address each claim in turn below.
 

 Security Measures
 

 Smith contends that a number of security measures utilized during his trial prejudiced him. He specifically focuses on the following measures: a large number of security personnel were present in and around the courtroom, including law enforcement officers who were armed; a second magnetometer was used outside the courtroom; parties coming to the end of the hallway where the courtroom was located, including jurors, were searched; attorneys were searched in front of the jurors; Smith had to wear a stun belt throughout the proceedings; those entering the courtroom had to show photo identification during parts of the trial; and several witnesses testified in red jail jumpsuits.
 

 Generally, a judge has discretion when determining the manner in which to ensure security and safety for those in the courtroom and may be reversed only for abuse.
 
 See Hellum v. Warden, U.S. Penitentiary-Leavenworth,
 
 28 F.3d 903, 907 (8th Cir.1994). We find that, given the magnitude and nature of this case, the trial court did not abuse its discretion in imposing the security measures that Smith contends prejudiced him. The security measures were justified based on the allegations in the indictment and the testimony at trial. As the trial court noted during a sidebar discussion of the security measures, at least one witness was allegedly
 
 *493
 
 killed because she was going to testify against Smith at his trial. Further, testimony showed that Smith had been able to contact people while he was incarcerated and to give orders relating to his business. Additionally, there were several incidents in which spectators made threats to members of the prosecution team or intimidated witnesses, even if not overtly.
 

 Smith first argues that the jury was prejudiced by the large number of security personnel present in and around the courtroom, including law enforcement officers who were armed. We disagree. The presence of added guards was justified due to the nature of the case, i.e., it involved organized criminal activity in which a number of individuals were killed or injured for interfering with the organization. Further, one of the State’s witnesses had recognized a courtroom spectator who was a killer. In
 
 United States v. Darden,
 
 70 F.3d 1507, 1533 (8th Cir.1995), the court employed a large number of security personnel in the courtroom and searched the defense attorneys within the view of the jurors. The court found the enhanced security to be justified because “each of the nine defendants in this case was charged with participating in an extraordinarily violent criminal enterprise with a history of conflict with law enforcement.” Moreover, in
 
 Holbrook v. Flynn,
 
 475 U.S. 560, 569, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), where four extra guards were present in the courtroom, the United States Supreme Court stated that the presence of officers during a trial would not necessarily make the jury think that the defendant is guilty, rather that “the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards.”
 

 Smith next argues that the presence of a second magnetometer and the searches of bags may have influenced the jury negatively. However, “additional security personnel and the use of metal detectors are even less prejudicial [than physical restraints] because of ‘the wider range of inferences that a juror might reasonably draw’ from their use.”
 
 Hellum,
 
 28 F.3d at 908 (quoting
 
 Holbrook,
 
 475 U.S. at 569, 106 S.Ct. 1340). Thus, courts across the country have approved of the use of metal detectors.
 
 See, e.g., State v. Aguilar,
 
 352 N.W.2d 395, 396 (Minn.1984) (authorizing the use of metal detectors and searches of people entering the courtroom). This type of security measure is a part of our daily experience and cannot be deemed prejudicial.
 

 Smith also argues that he was prejudiced when his defense attorneys were “wanded” in front of the jury. However, where the jurors in Smith’s trial were themselves being searched and wanded, they would not be surprised or prejudiced to see the defense attorneys subjected to similar measures.
 
 See Aguilar,
 
 352 N.W.2d at 397 (holding that the defendant was not prejudiced when the jurors saw him being searched where the jurors themselves had been frisked).
 

 Smith further argues that the jury was prejudiced because he had to wear a stun belt during trial and that the use of this stun belt implied his guilt. A trial judge has discretion when it comes to the issue of whether or not to restrain the defendant.
 
 See Elledge v. State,
 
 408 So.2d 1021, 1023 (Fla.1981). The record clearly reflects that although the trial court found the belt necessary because of the magnitude of the case, it also found that Smith could not be prejudiced by its use because
 
 *494
 
 it was not visible to anyone, including the judge. It is true that while restraints are sometimes necessary, a defendant generally has the right to appear free from restraint while in front of the jury.
 
 See Illinois v. Allen,
 
 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). However, we have held that the use of a stun belt is allowed because it is less visible than the alternative of shackles.
 
 See Weaver v. State,
 
 894 So.2d 178, 195 (Fla.2004). Because the stun belt was not visible, Smith appeared free from restraint and, as a result, he was not prejudiced.
 

 Smith also argues that it was wrong to require observers to show photo identification before being permitted to enter the courtroom. This procedure was not put into place until one of the State witnesses claimed to recognize a courtroom spectator as a “known killer” and feared for his safety. Requiring spectators to identify themselves when a witness fears for his life is within the discretion of the trial judge.
 
 See Resnick v. State,
 
 319 So.2d 167, 169 (Fla. 1st DCA 1975) (“[Wjhen a judge is so advised of pending potential violence, he has the inherent authority and the duty to invoke such security as under existing circumstances appears to be reasonably necessary for the protection, not only of the judge, but of all lawfully before the Court.”).
 

 Finally, Smith argues that he was prejudiced by the “theatrical presentation” of several State witnesses in jail jumpsuits and handcuffs. The trial court found no prejudice to the defense and if prejudicial to anyone, it was the State, which was presenting convicted felons as its witnesses. The State argues that it was abundantly clear from the witnesses’ testimony that they were prisoners, and security measures for these prisoners had nothing to do with the defendant. We agree. Reason and common human experience dictate that a witness who testifies that he is currently incarcerated might be dressed in prison garb. Moreover, there were additional safety concerns related to many of the State witnesses because
 
 they were
 
 prisoners. Their appearance in red jumpsuits would alert everyone that they were inmates if there was an attempted escape from custody.
 

 Because Smith fails to demonstrate that the trial court abused its discretion in imposing these security measures and also fails to demonstrate prejudice, relief is not warranted on this claim.
 

 Failure to Strike Jury Panel
 

 Smith next contends that the trial court erred in denying his motion to strike the entire jury panel based on prejudice caused by the comment, “God bless you all. Have a blessed day,” that was made by Smith’s mother to them as she was leaving the courtroom during jury selection.
 

 When Smith’s mother was leaving the courtroom during jury selection, she made a statement to the seventy venire members in the hallway. According to those who heard the comment, the mother stated to the entire group, “God bless you all. Have a blessed day.” When this was brought to the trial court’s attention the following day, the court individually questioned several jurors about the incident and learned that several jurors had been discussing the matter at lunch that day. The court then individually questioned the jurors who might have been discussing the incident. Attorneys for both sides then requested individual voir dire of the jury venire and as a result, the court decided to question all of the members of the venire in small groups about the incident. The attorneys were also permitted to inquire of the jurors. After questioning the entire jury panel in small groups, the defense moved to have the entire panel struck
 
 *495
 
 based on the comment being viewed as inappropriate and made by a family member to influence the jury. The defense argued that the comment would have a negative influence on whoever heard it and result in prejudice to Smith. The trial-court denied the motion to strike the entire panel, but issued an order that Smith’s mother not set foot in the courtroom until she was called as a witness and have no conversation with any jurors or potential jurors.
 

 A trial court has discretion to determine what remedy is required when a comment is made to the jurors outside the presence of the court.
 
 See Hutchinson v. State,
 
 882 So.2d 943, 956 (Fla.2004),
 
 abrogated on other grounds by Deparvine v. State,
 
 995 So.2d 351 (Fla.2008);
 
 Street v. State,
 
 636 So.2d 1297, 1301 (Fla.1994). The exercise of that discretion will not be disturbed absent a showing of bias or prejudice to the defendant.
 
 See United States v. Hernandez,
 
 921 F.2d 1569, 1578 (11th Cir.1991). The record demonstrates that the trial court did not abuse its discretion in denying Smith’s motion to strike the entire jury venire. The trial court acted appropriately by questioning the jury panel to determine who had heard the comment and whether the comment would affect them ability to be impartial. Moreover, the comment made to the jurors did not disclose evidence or facts not presented at trial and did not even constitute an opinion about the defendant’s guilt or innocence.
 
 See, e.g., Hutchinson,
 
 882 So.2d at 956 (involving a restaurant patron who approached the jurors and told them that she hoped they would hang the defendant);
 
 Street,
 
 636 So.2d at 1301 (involving a person who passed the jury in the hallway and muttered “guilty”).
 

 Accordingly, Smith fails to demonstrate that any of the jurors on the venire exhibited actual bias and as a result that he was prejudiced. None of the jurors who served on Smith’s jury stated that the comment would affect their ability to rule fairly in his case. In fact, a number of jurors were struck from the venire based on them failure to report the juror discussions related to the mother’s comments. Additionally, the prospective jurors who voiced problems about the mother’s comments were actually struck for cause. Therefore, we find no merit to this claim.
 

 Meaning of Terms in Recorded Conversations
 

 Smith contends that the trial court erred by permitting John Doe gang member Julian Mitchell to interpret code terms used in the phone conversations of John Doe members that were intercepted by the wiretap and recorded. Smith’s specific claims are that (1) Mitchell did not qualify to offer his lay opinion regarding the meaning of the terms used in the conversations; and (2) he was never qualified as an expert in the area that he testified about. On the other hand, the State argues that the claim is procedurally barred because it was not preserved for appellate review. The State also argues in the alternative that the claim is without merit. We agree.
 

 The State introduced all of the intercepted conversations into evidence through both recordings and transcripts. To help the jury make sense of these conversations, State witness Mitchell was asked to interpret the conversation after the recording was played. Before testifying about the tapes, Mitchell testified that he had listened to the recordings of each of the intercepted calls four or five times prior to trial and had reviewed the transcripts of the calls for accuracy as well. Mitchell was called to the stand on the morning of Wednesday, November 24, 2004. He testified until the court recessed at 4:00 p.m. and the judge released the
 
 *496
 
 jury for the Thanksgiving holiday. During this entire day of testimony, the defense never objected to Mitchell’s offering opinion testimony or not being an expert witness. At a sidebar discussion at the end of proceedings on Wednesday afternoon, the court told the State that this wiretap evidence was repetitive and only one more hour would be permitted when the trial resumed the next Monday. It was when court resumed on Monday, November 29, and Mitchell took the stand again that the defense voiced an objection to Mitchell’s testimony. The defense argued that Mitchell was “assuming facts not in evidence” and that he had not been qualified as an expert in the field in which he was being asked to give an opinion. The court overruled the objection. Later, the defense objected to Mitchell summarizing some of the calls and that this method of testifying violated the best evidence rule. The State explained that it was summarizing the calls because the court had given them a limited amount of time to present this testimony. The court overruled both objections.
 

 The record demonstrates that Smith never objected to Mitchell’s testimony on the basis of improper lay witness opinion or the predicate of reliability. Accordingly, these claims cannot be considered on appeal.
 
 See Steinhorst v. State,
 
 412 So.2d 332, 338 (Fla.1982) (“[I]n order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below.”). Also, with regard to the other belated objections raised by Smith, these claims are also not properly preserved because defense counsel permitted Mitchell to testify without objection for an entire day of trial, only objecting to his testimony when court resumed after the holidays.
 

 Even if the claims based on the belated objections were properly preserved for appellate review, we find that these claims are without merit. Florida’s Evidence Code provides that a lay witness may testify in the form of opinion when the witness cannot otherwise accurately communicate what he or she perceived so long as the opinion will not mislead the trier of fact and the opinion is not one that requires special knowledge, skill, experience, or training. § 90.701, Fla. Stat. (2005). Section 90.702 governs opinion testimony by expert witnesses and provides that a witness can be qualified as an expert by knowledge, skill, experience, or training. § 90.702, Fla. Stat. (2005). Whether a witness is qualified as an expert is largely a matter of discretion for the trial court.
 
 See, e.g., Ramirez v. State,
 
 542 So.2d 352, 355 (Fla.1989) (“The determination of a witness’s qualifications to express an expert opinion is peculiarly within the discretion of the trial judge, whose decision will not be reversed absent a clear showing of error.”). While counsel must elicit from the witness the part of the witness’s background that qualifies him as an expert, counsel need not formally proffer the witness as an expert to the court.
 
 See
 
 Charles W. Ehrhardt,
 
 Florida Evidence
 
 § 702.1, at 687 (2007 ed.).
 

 Mitchell clearly had both knowledge and experience regarding the codes. In fact, the State established in direct questioning that Mitchell used these codes on a daily basis in conversations and especially in phone conversations “to keep the police from knowing our business.” Mitchell had already testified at length earlier in the trial about the operation and organization of John Doe. His testimony about the John Doe gang was completely substantiated by the testimony of numerous other John Doe witnesses. Moreover, the other witnesses confirmed that Mitchell was third in the command structure of John Doe. Addition
 
 *497
 
 ally, John Doe member Eric Mitchell independently testified about the codes used by John Doe in phone conversations to indicate the various types and quantities of drugs. These codes were the same as Julian Mitchell’s interpretation of the taped conversations.
 

 Moreover, courts have held that law enforcement officers and others may testify about codes used by drug dealers to thwart detection.
 
 See, e.g., United States v. Brown,
 
 872 F.2d 385, 392 (11th Cir.1989) (approving testimony by co-defendant and special agent about meaning of terms “paper,” “candy,” “dresses,” certain numbers, “the full house,” and certain real estate terms in intercepted conversations in drug prosecution). In
 
 Brooks v. State,
 
 762 So.2d 879, 891-92 (Fla.2000), we held that a trial court did not abuse its discretion by permitting an experienced dealer of crack cocaine to testify as an expert regarding the identity and approximate weight of the rocky substance in a bag. Furthermore, police officers have testified as expert witnesses regarding the street language in the drug culture and explained to the jury their interpretation of the words used, which occurred in contexts in which their normal lexicographical meanings would be illogical and meaningless.
 
 See Daniels v. State,
 
 381 So.2d 707, 709-10 (Fla. 1st DCA 1979),
 
 aff'd,
 
 389 So.2d 631 (Fla.1980);
 
 Slater v. State,
 
 356 So.2d 69, 71 (Fla. 1st DCA 1978). Accordingly, we find this claim not preserved for appellate review and to be without merit.
 

 Admission of Police Report
 

 Smith claims that the trial court erred when it admitted into evidence a police report regarding Dominique Johnson’s killing. The State introduced the report through Detective Frank Alphonso, who had investigated the Johnson killing. Detective Alphonso had recovered a copy of this report from the nightstand in Corey Smith’s bedroom in his mother’s house when a search warrant related to the John Doe drug investigation was executed. The report included information about Cynthia Brown coming forward as a witness to the shooting and the fact that she had identified Smith as the shooter. When the State attempted to enter the report into evidence, defense counsel objected that the report was full of hearsay. The State agreed to redact portions of the report and reiterated that the part it wanted admitted was that Cynthia Brown had identified Smith as the shooter and was planning to testify against him at trial, which gave Smith motive for killing Brown. The court held that the report was admissible for this purpose but other portions of the report were hearsay that were not relevant for this purpose and should be redacted. We agree.
 

 The Florida Evidence Code defines hearsay as “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” § 90.801(l)(e), Fla. Stat. (2005). If an out-of-court statement is not offered to prove the facts contained in the statement, it is not hearsay. However, even where an out-of-court statement is offered for a purpose other than proving the truth of its contents, the statement is only admissible when the purpose for which the statement is being offered is a material issue in the action.
 
 See Foster v. State,
 
 778 So.2d 906, 915 (Fla.2000). A statement may be offered to prove a variety of things besides its truth, including to show motive or knowledge.
 
 See id.; Escobar v. State,
 
 699 So.2d 988, 997 (Fla.1997).
 

 In the instant case, the State did not introduce the report to prove the truth of the matter asserted, i.e., that Smith killed Johnson, but to show that Smith had knowledge about Brown being a witness
 
 *498
 
 against him and this gave him a motive to have her killed. Similar to
 
 Foster,
 
 where we held that an out-of-court statement could be offered to prove knowledge of the statement, which was a material issue in the case, the police report in this case clearly goes to the material issues of knowledge and motive in Brown’s murder. The trial court reiterated numerous times and gave a limiting instruction that the police report was being introduced to prove Smith’s motive and knowledge and not that Smith killed Johnson. This is also similar to
 
 Escobar
 
 where the defendant’s own hearsay statement was admitted to show motive. Based on the Florida Evidence Code and applicable case law, we conclude that the police report was not hearsay because it was not admitted to prove that Smith killed Dominique Johnson. Rather, it was admitted to prove Smith’s knowledge and motive in the Brown killing, both of which were relevant issues. Therefore, the report was properly admitted.
 

 Limiting Defense Cross-Examination
 

 Smith claims that he was denied a fair trial because the trial court limited his cross-examination of three witnesses: Anthony Fail, Demetrius Jones, and medical examiner Dr. Emma Lew. As to Fail and Jones, Smith claims that the court improperly restricted his questions about uncharged crimes they had committed. As to Dr. Lew, Smith argues that he was limited in his questioning about autoerotic asphyxia.
 

 Anthony Fail
 

 Anthony Fail was a member of the John Doe organization. On direct examination, he testified that he was currently incarcerated on two life sentences, plus a thirty-year sentence with a fifteen-year mandatory minimum; had eight prior felony convictions; had no plea agreements with either the state or federal prosecutors; had agreed to testify because the victim Wilson had been his girlfriend; and had been involved in the drug business for a number of years and had engaged in various acts of violence.
 

 On cross-examination, defense counsel was able to elicit that Fail had hurt, shot, and beat up people for the defendant. The State objected when defense counsel started to question Fail about his involvement in specific violent acts unrelated to those that were the subject of Smith’s trial. The court held that defense counsel was not permitted to inquire about these unrelated uncharged crimes because they were not relevant to this proceeding or the witness’s testimony. However, defense counsel was able to elicit that Fail sold drugs and that he was a murderer for hire for the defendant. Moreover, defense counsel was able to question Fail at length about another incident in which he shot a companion in the back of the head and how the fees for a murder for hire are negotiated. Through questioning, defense counsel repeatedly made the point that Fail was a murderer for hire and got paid to kill. Only when defense counsel persisted in asking how many people had Fail killed, even after he responded “not many,” did the court sustain the State’s objection and restrict the questioning.
 

 Demetrius Jones
 

 On direct examination, Jones testified that he had been selling and using drugs for more than ten years; he was currently incarcerated for fifteen years; he had eleven previous felony convictions stemming from six different cases; he had plea agreements with both the federal government and the State of Florida, which required him to testify truthfully at this trial; and he had agreed to lie for Smith about the Johnson shooting and perjured himself in his deposition.
 

 
 *499
 
 On cross-examination, defense counsel was able to elicit that Jones had not been charged in the indictment in this case; had never been indicted for any drug offenses in federal court; was incarcerated for carjacking; had lied to a police officer about his name and went to prison under an alias; had committed perjury with regard to his plea bargain with the State; had made prior inconsistent statements in his deposition; and had removed a gun, money, and drugs from Johnson after he was shot but before the police arrived. When defense counsel began to inquire about the factual basis of Jones’ convictions, the trial court sustained the State’s objection and explained that defense counsel could not ask questions about the nature of the charges when impeaching the witness with his prior convictions. The court further held that defense counsel could inquire about Jones’ plea bargains related to his testimony and his bias for his testimony.
 

 Dr. Emma Lew
 

 Dr. Lew was the medical examiner who performed the autopsy on Cynthia Brown’s body and testified at trial. On direct examination, Dr. Lew testified that Brown had died from asphyxiation, which can be caused by a number of different mechanisms such as smothering, strangulation, drowning, carbon monoxide poisoning, and positional constriction of the airway. Dr. Lew discounted all of these mechanisms except smothering based on the crime scene evidence and Brown’s body. Dr. Lew stated that the evidence was consistent with Brown being smothered with a bed pillow.
 

 On cross-examination, defense counsel asked Dr. Lew if it was possible that Brown died from asphyxiation while having sex with her face in a pillow. Dr. Lew responded this was unlikely as the person would start flailing to get her breath and to get the other person off of her. Defense counsel then asked if both people were drunk and using drugs could she be placed in 'a position where she might be asphyxiated during sex. Dr. Lew responded that it was unlikely because she would not have had her underpants on if she died during sex.
 
 [8]
 
 Defense counsel also asked whether the underwear could have been placed back on the body after she died in order to cover up the scene. Dr. Lew responded that if that were the case they did not do a good job as there was no evidence of activity on the bed, Brown was covered up with the bed clothes when she was found, and a bloody pillow was found under her head. Defense counsel further asked if it was possible that Brown could have had a heart attack after having sex and using cocaine and the other person staged her body when he realized she was dead. Dr. Lew stated it was possible and was consistent with the evidence. Defense counsel then asked whether sex could be described as a violent activity. Dr. Lew responded that you usually are not holding your breath during sex. Defense counsel then responded but are not there people who try to limit their breathing during the sex act. The State objected that to this question as irrelevant, speculative, and not based on the evidence, which was sustained. Then defense counsel asked if there was such a thing as autoerotic asphyxia. Dr. Lew said yes there is such a thing. When defense counsel asked Dr. Lew to explain this to the jury, the State objected as to relevancy and the court sustained that objection. The trial court held that defense counsel could ask Dr. Lew if it autoerotic asphyxia applied in
 
 *500
 
 this case but could not ask Dr. Lew to explain the asphyxia. The court told defense counsel that it could call its own expert on this matter. Defense counsel never called Dr. Lew or any other expert as a defense witness to testify about au-toerotic asphyxiation.
 

 The Florida Evidence Code provides that “[cjross-examination of a witness is limited to the subject matter of the direct examination and matters affecting the credibility of the witness.” § 90.612(2), Fla. Stat. (2005). The credibility of a witness may be attacked “by evidence that the witness has been convicted of a crime if the crime was punishable by death or imprisonment in excess of 1 year under the law under which the witness was convicted, or if the crime involved dishonesty or a false statement regardless of the punishment.” § 90.610(1), Fla. Stat. (2005). A trial judge has wide discretion to impose reasonable limits on cross-examination.
 
 See Delaware v. Van Arsdall,
 
 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986);
 
 Geralds v. State,
 
 674 So.2d 96, 100 (Fla.1996);
 
 Jones v. State,
 
 580 So.2d 143, 145 (Fla.1991). A judge’s determination to allow or disallow questioning in that regard is not subject to review unless the determination is clearly erroneous.
 
 See Sanders v. State,
 
 707 So.2d 664, 667 (Fla.1998).
 

 We conclude that the trial court did not improperly restrict cross-examination of Fail or Jones. In fact, the trial court’s holdings are entirely consistent with the law because questioning about the underlying facts of a conviction is not allowed. Defense counsel was not permitted to inquire into the nature of the witnesses’ prior convictions.
 
 See Floyd v. State,
 
 913 So.2d 564, 576 (Fla.2005);
 
 Cummings v. State,
 
 412 So.2d 436, 438 (Fla. 4th DCA 1982). However, defense counsel was permitted to question their veracity and their bias.
 

 Moreover, the record shows that defense counsel was able to extensively question Dr. Lew about the cause of Brown’s death. Through his questioning, counsel was also able to call into question the manner of death as homicide. He was able to explore his death during sex scenario fairly extensively. In fact, the only restriction was not being able to ask Dr. Lew to explain what autoerotic asphyxia involves. We conclude that the trial court’s determination to disallow this questioning was not an abuse of discretion because defense counsel’s questioning went beyond the scope of cross-examination. Additionally, the defense was free to either call Dr. Lew as a defense witness or to call another expert to explain autoerotic asphyxia more fully. We find no merit to Smith’s claims regarding the questioning of Fail, Jones, and Dr. Lew.
 

 Medical Examiner Opinion Testimony
 

 During redirect questioning, the State asked the medical examiner a hypothetical question relating to Brown’s death. The State asked the following hypothetical:
 

 Let’s assume for a moment that a woman named Cynthia is a material witness in a homicide case.
 

 Assume the defendant in that homicide case hired her boyfriend to kill her. Further assume, for the purpose of this hypothetical, Doctor, that the defendant in this homicide case did not want bullets involved.
 

 Assume the defendant in the homicide case that hires the boyfriend does not want bullets involved because he does not want it to come back to him. And assume also that he wants her strangled or suffocated.
 

 Assume the lady, the material witness, Cynthia, was taken to a hotel by a boyfriend — by her boyfriend and assume
 
 *501
 
 the boyfriend places a pillow over her face and assume she struggles to get her breath, to get the pillow off of her face, but died from asphyxia, from a lack of oxygen.
 

 Are your findings, Doctor Lew, consistent with that hypothetical?
 

 Defense counsel objected to the question as being compound, confusing, and narrative, which the court sustained. The State then presented the same hypothetical set of facts but omitted the name of the witness. The State asked, “Based on your training and expertise and analysis of that hypothetical, are the physical findings of asphyxia consistent with that scenario?” The defense objected that it was not a proper basis for this expert’s opinion, which the court sustained. The State then asked the expert witness to assume the facts in the second hypothetical and whether those facts were consistent with asphyxia as a cause of death and homicide. The witness replied in the affirmative. Defense counsel did not object to this last question but instead moved for a mistrial, which the court denied.
 

 Smith claims that this hypothetical question was erroneous and the trial court erred by not granting his motion for a mistrial. Section 90.704, Florida Statutes (2007), permits an expert to base an opinion on inadmissible facts or data made known to the expert outside the courtroom. Section 90.705(1) permits the expert to testify without prior disclosure of the underlying facts or data. Thus, an expert may express an opinion and base the opinion on facts of which the expert does not have personal knowledge without the use of a hypothetical question. The Florida Evidence Code does not prohibit counsel from using a hypothetical question and permits counsel to decide whether to do so. See Charles W. Ehrhardt,
 
 Florida Evidence
 
 § 704.2, at 755-56 (2007 ed.).
 

 While the Florida Evidence Code does not specify the manner in which a hypothetical question can be used, Florida courts have established a number of guidelines. A hypothetical question must be based on facts that are supported by evidence which has been introduced at trial.
 
 See North Broward Hosp. Dist. v. Johnson,
 
 538 So.2d 871 (Fla. 4th DCA 1988). In framing the question, counsel may rely on the evidence introduced during trial in the light most favorable to his theory. Therefore, the question may be based on a fact in dispute as long as there is evidence in the record to support the fact.
 
 See Antrey v. Carroll,
 
 240 So.2d 474, 476 (Fla.1970);
 
 Nationwide Mutual Ins. Co. v. Griffin,
 
 222 So.2d 754 (Fla. 4th DCA 1969).
 

 In the instant case, defense counsel’s objections to the State’s first hypothetical question were as to the form of the question itself — that it was in a narrative form and compound — not that the State’s hypothetical question was based on facts not in evidence. The defense’s objection to the second version of the hypothetical was, “This is not a proper basis for this expert’s opinion.” The court sustained that objection. But defense still did not object that the question assumed facts not supported in the evidence. Defense counsel never objected to the third question.
 

 This exchange involved the way the question was being asked, not whether the hypothetical itself could be asked. Thus, the trial court sustained defense counsel’s objection to the form of the question, not to the fact that the question could be asked if properly phrased, which the State did on its final try, and to which defense counsel did not object. Instead, defense counsel moved for a mistrial “based on the improper and inappropriate hypothetical question that had to do exact
 
 *502
 
 ly with the facts of the case they asked of a witness that they knew could not give such an opinion.” The trial court denied the defense motion for a mistrial. The standard of review applied to motions for mistrial is abuse of discretion.
 
 See Floyd v. State,
 
 913 So.2d 564, 576 (Fla.2005). The trial court did not abuse its discretion in denying the motion for a mistrial. In fact, a proper hypothetical question must be based on the facts of the case that have been presented at trial. Further, it is entirely permissible for an expert to give an opinion based on a hypothetical question. Therefore, a mistrial was not appropriate because the question and answer were not improper. Smith is not entitled to relief on this claim.
 

 Disclosure of Witness Statement
 

 Smith contends that the trial court erred in not granting a new trial based on the nondisclosure of a new oral statement made by Mark Roundtree in July 2004. Prior to the penalty phase, the State filed an amended discovery exhibit, which revealed that Roundtree made statements to polygraph operator George Slat-tery in July 2004. In this statement, Roundtree denied committing the murder of Leon Hadley (a murder he was convicted of in September 1996 and given a sentence of life in prison), stated that Smith killed Hadley, and revealed that Round-tree had previously implicated himself in Hadley’s homicide so that he could serve as a witness at Smith’s trial and possibly gamer some sentencing concession.
 

 Based on this disclosure, Smith filed a motion for a new trial, arguing that the State had committed a violation of
 
 Brady v. Maryland,
 
 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose this statement before trial. The State asserts that the statement was not
 
 Brady
 
 material, but if the State had a duty to disclose it, there was no prejudice to Smith’s defense by its late disclosure.
 

 Under
 
 Brady,
 
 the State violates a defendant’s due process rights when it fails to disclose evidence that is favorable to the defendant and is material to either his guilt or the sentence imposed. This includes both exculpatory evidence and impeachment evidence. The evidence is material “if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability’ is a probability sufficient to undermine confidence in the outcome.”
 
 United States v. Bagley,
 
 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).
 

 Mark Roundtree was listed as a State witness in the guilt phase of Smith’s trial. However, Roundtree was never called to testify by the State or the defense. Roundtree made several statements about the Hadley murder prior to Smith’s trial. Copies of these statements were disclosed to the defense before Smith’s trial. In his April 1996 statement, Roundtree denied any involvement in the Hadley murder and stated that he did not know who had shot Hadley. Slattery reported that the polygraph indicated deception in Roundtree’s negative response to the question “do you know who shot Leon Hadley.” On January 25, 2001, Roundtree gave two more statements to Slattery.
 
 [9]
 
 At that time,
 
 *503
 
 Roundtree had been convicted of the Had-ley murder and had completed all appeal and postconviction proceedings. In the first statement on January 25, 2001, Roundtree stated that Smith had told him about the Hadley shooting and Smith had admitted that he, Phil White, and Kelvin Cook were in the car and participated in Hadley’s shooting. Roundtree then stopped his statement to Slattery in order to speak to Detective Alphonso. Round-tree then made a second statement, in which he stated that he had also been in the car during the Hadley shooting and had shot Hadley with an AK-47.
 

 Roundtree made another oral statement in July 2004, in which he disavowed being in the car during the Hadley shooting. Roundtree explained that he had said he was involved in the murder in order to make himself a better State witness for Smith’s trial in hopes of getting a reduced sentence. The July 2004 statement was not exculpatory to Smith as Roundtree still maintained that Smith had admitted shooting Hadley.
 

 The trial court heard argument on the defense motion for a new trial on February 7, 2005, before the penalty phase commenced. The State explained that there had not been a written statement or report regarding Roundtree’s July 2004 statement to Slattery. The State argued that Roundtree had given multiple prior inconsistent statements regarding the Hadley murder, that the defense always knew about these other statements, and that the defense had told the jury that Roundtree had been convicted of Hadley’s murder. The State also noted that Roundtree was never called as a witness in Smith’s case. Instead, the State had relied on the testimony of Phil “White, the driver of the car during Hadley’s shooting, and Smith’s own admissions to Tricia Geter about his involvement in Hadley’s murder. Despite defense counsel’s argument that Round-tree’s July 2004 statement would have supported the defense theory that the State witnesses were liars who were perjuring themselves to secure favorable treatment from the State, the court ruled that another inconsistent statement from Roundtree was not significant.
 

 We conclude that Roundtree’s July 2004 statement does not meet the
 
 Brady
 
 materiality standard. There is no reasonable probability that had this new statement, which was not exculpatory to Smith and had been preceded by multiple prior inconsistent statements by the same person, been disclosed to the defense the result of the proceeding would have been different. Thus, our confidence in the outcome of the proceeding has not been undermined.
 

 However, we still must consider whether the State’s failure to disclose this new statement constituted a violation of Florida’s discovery rules and, if so, whether the violation “materially hindered the defendant’s trial preparation or strategy.”
 
 Scipio v. State,
 
 928 So.2d 1138, 1150 (Fla.2006) (quoting
 
 State v. Schopp,
 
 653 So.2d 1016, 1020 (Fla.1995)). This analysis does not focus on whether the discovery violation would have made a difference in the verdict, but whether the defense was procedurally prejudiced.
 
 Id.
 

 Under Florida Rule of Criminal Procedure 3.220(b), the prosecutor has an obli
 
 *504
 
 gation to provide discovery. Rule 3.220Q) imposes a continuing duty to disclose. These rules of criminal procedure provide in pertinent part:
 

 (b) Prosecutor’s Discovery Obligation.
 

 (1) Within 15 days after service of the Notice of Discovery, the prosecutor shall serve a written Discovery Exhibit which shall disclose to the defendant and permit the defendant to inspect, copy, test, and photograph the following information and material within the state’s possession and control:
 

 (A) a list of the names and addresses of all persons known to the prosecutor to have information that may be relevant to any offense charged or any defense thereto....
 

 [[Image here]]
 

 (B) The statement of any person whose name is furnished in compliance with the preceding subdivision. The term “statement” as used herein includes a written statement made by the person and signed or otherwise adopted or approved by the person and also includes any statement of any kind or manner made by the person and written or recorded or summarized in any writing or recording....
 

 [[Image here]]
 

 (j) Continuing Duty to Disclose. If, subsequent to compliance with the rules, a party discovers additional witnesses or material that the party would have been under a duty to disclose or produce at the time of the previous compliance, the party shall promptly disclose or produce the witnesses or material in the same manner as required under these rules for initial discovery.
 

 Fla. R.Crim. P. 8.220(b)(1), (j).
 

 However, the failure to disclose Round-tree’s July 2004 to the defense did not
 
 materially
 
 hinder Smith’s trial preparation or strategy. At trial, defense counsel was able to raise questions as to the veracity of the witnesses who testified against Smith, was able to elicit that various witnesses had perjured themselves by lying in their deposition testimony, and was able to show that some witnesses were testifying as part of a plea agreement. Further, even if Smith had called Roundtree as a witness on the basis of the July 2004 statement, Smith would have had an unreliable witness who now claimed that Smith, and not Roundtree, killed Hadley, and who had given various inconsistent statements about the murder. Further, Roundtree’s admission that he was willing to lie and implicate himself in a murder in order to get a reduced sentence does not prove that the other witnesses were lying at Smith’s trial. In fact, at trial Smith did use Roundtree’s conviction to suggest that several witnesses were lying about Smith’s involvement in Hadley’s murder in order to get Roundtree released.
 

 This is quite different from
 
 Scipio,
 
 where the medical examiner investigator materially recanted his prior statement about finding a gun under the victim’s body. The defense in
 
 Scipio
 
 intended to rely heavily on the investigator’s testimony to support its theory of self-defense. Had the defense in
 
 Scipio
 
 been informed about this change in testimony, it could have pursued a different theory of defense. Here, the undisclosed statement was not an alteration that impeded the defense trial strategy or preparation. Thus, Smith was not entitled to a new trial on this basis.
 

 Disclosure of Inconsistent Testimony
 

 Smith asserts that the trial court erred in not conducting a Richardson
 
 [10]
 
 inquiry when State witness Carlos Walker testified
 
 *505
 
 inconsistently with his deposition. The State contends that the claim was not preserved for review; that Smith has not shown a discovery violation; and that if there was a discovery violation, the violation was harmless beyond a reasonable doubt.
 

 As discussed above, the State has a continuing obligation to disclose the statement of any person who has “information that may be relevant to any offense charged or any defense thereto.” Fla. R.Crim. P. 3.220(b)(1). Carlos Walker was listed as a State witness and actually testified for the State during the guilt phase of trial. In his pretrial deposition by the defense, Walker stated that he never talked to Smith about the Johnson case. On direct examination by the State, Walker admitted that he lied in his deposition because he was afraid of retaliation by Smith. Walker stated that he saw Smith with Jackie Pope’s deposition “and looked what happened to him.” Walker then testified that Smith told him that Cynthia Brown had been “snitching” on him about the Johnson murder and “she got to come up dead for him to win trial.” Walker also overheard Smith discussing Brown with Julius Stevens, Eric Stokes, and Latravis Gallashaw. In this conversation, Smith told the trio that he wanted Brown to “come up dead in order for him to win the trial.”
 

 Walker also testified about a meeting he observed between Smith and Chazre Davis at Smith’s house regarding Brown. Smith stated that he wanted Brown to be “smothered or strangled” and that he did not want any bullets or shell casings or other evidence on the scene. Smith offered Davis nine ounces of powder cocaine to kill Brown. Walker also testified that Smith bragged about Brown’s murder at a party celebrating the dismissal of the Johnson murder charges against him; Smith bragged that the State “couldn’t hold him” and stated that Davis “handled his business.”
 

 The defense did not object to this testimony by Walker. Instead, the defense moved for a mistrial when the State’s direct examination was finished. The defense argued that the State had called Walker to the stand without informing the defense that Walker had lied in his deposition. The State responded that the defense knew what the issues were and also had Walker’s prior statement to the police that was consistent with his trial testimony. The court told the defense to “impeach him while you can” and denied the motion for a mistrial.
 

 Walker gave three statements prior to trial. In his initial statement to the police, he implicated Smith in the murders of Brown and Pope. In his deposition taken by the defense, Walker denied knowing about any involvement by Smith in the murders. Walker apparently made another statement to the State sometime before trial in which he told the prosecutor that he had lied in his deposition and would testify consistent with his initial statement. The State never disclosed this fact to the defense, a discovery violation under rule 3.220(l)(b), (j).
 

 When a discovery violation is brought to a trial court’s attention, the court may conduct a
 
 Richardson
 
 hearing to inquire about the circumstances surrounding the State’s violation of the discovery rules and examine the possible prejudice to the defendant.
 
 Richardson v. State,
 
 246 So.2d 771 (Fla.1971). In the past, the court’s failure to a conduct a
 
 Richardson
 
 hearing was per se reversible error. In
 
 State v. Schopp,
 
 653 So.2d 1016, 1020 (Fla.1995), this Court concluded that “there are cases ... where a reviewing court can say beyond a reasonable doubt that the defense was not prejudiced.” When the reviewing court makes such a
 
 *506
 
 determination, then the discovery violation is deemed harmless and reversal is not warranted.
 
 Id.
 

 This Court recently clarified the nature of the harmless error inquiry when a discovery violation occurs.
 
 See Scipio v. State,
 
 928 So.2d 1138 (Fla.2006). The inquiry is whether the violation “materially hindered the defendant’s trial preparation or strategy.”
 
 Id.
 
 at 1150 (quoting
 
 Schopp,
 
 653 So.2d at 1020). The analysis is not whether the jury’s verdict would have been different, but rather whether the defense was procedurally prejudiced.
 
 Id.
 
 “[Ojnly if the appellate court can say beyond a reasonable doubt that the defense was not procedurally prejudiced by the discovery violation can the error be considered harmless.”
 
 Schopp,
 
 653 So.2d at 1021.
 

 The State contends that this issue was not properly preserved by Smith at trial because defense counsel moved for a mistrial rather than objecting because of the discovery violation. However, Florida courts have concluded that a motion for a mistrial can preserve a discovery violation claim if the motion reasonably informs the court of the nature of the complaint.
 
 See Raffone v. State,
 
 483 So.2d 761 (Fla. 4th DCA 1986). There are no exact “magic words” or phrases which must be used by the defense in order to necessitate the inquiry; only the fact that a discovery request has not been met.
 
 Copeland v. State,
 
 566 So.2d 856, 858 (Fla. 1st DCA 1990);
 
 In re F.R.,
 
 539 So.2d 588, 589 (Fla. 1st DCA 1989). In support of the motion for a mistrial in the instant case, the defense argued that the State “should have noticed in advance of the perjury so that we could at least find out what was going on.” This was adequate to inform the court that a discovery violation had occurred and prompt an inquiry into the circumstances and whether the defense was prejudiced. Thus, we conclude that the claim was preserved below.
 

 Next, the State argues that no discovery violation occurred. We do not agree. When the defense moved for a mistrial, the State responded that the defense knew what the issues were and had possession of Walker’s prior statement to the police that was consistent with his trial testimony. In its brief to this Court, the State notes that several pretrial statements by Walker were disclosed to the defense and the defense has not identified any statement by Walker that was not disclosed to the defense. However, the trial record clearly indicates that the State had prior knowledge that Walker intended to recant his deposition testimony (in which he disavowed any conversations with Smith about the Johnson case and any knowledge about Smith’s involvement in Brown’s murder). As soon as the prosecutor began questioning about the Johnson case, she asked Walker to explain his deposition testimony and why he had lied. The fact that Walker’s recantation of his deposition testimony was not reduced to writing did not relieve the State of its continuing discovery obligation as to this witness. The State committed a discovery violation “when it failed to disclose to [Smith] a material change in the State [witness’s] deposition statement.”
 
 Scipio,
 
 928 So.2d at 1145.
 

 However, our examination of the record reveals that the defense was not procedurally prejudiced by this discovery violation. The defense theory as to Brown’s murder was that her death was not a homicide, but the result of either a heart attack or stroke caused by cocaine use or asphyxiation during sex. While Walker’s testimony was antithetical to this theory, he was only one of many witnesses who testified about Smith’s plans to have Brown murdered. Anthony Fail testified
 
 *507
 
 that he overheard Smith and his mother discussing various ways to kill Brown, including poison and strangling; that Smith offered him $50,000 to kill Brown and was emphatic that she not be shot and there not be any evidence that could lead back to Smith; and that Smith put aside $20,000 to pay Brown’s boyfriend Davis after he killed her. Herbert Daniels testified that he heard Smith talk to Brown’s boyfriend about the killing and the method. Trida Geter testified that Smith asked her if she could acquire pure heroin to give Brown in order to make her heart stop and stated his intent to kill Brown. Julian Mitchell testified that after Brown was killed Smith stated that he had to have Brown killed. Even if the defense knew that Walker was not going to testify consistent with his deposition but in line with these witnesses, which is what Walker did, the defense would not have devised a different trial strategy. Thus, we conclude “beyond a reasonable doubt that the defense was not procedurally prejudiced by the discovery violation” and the error was harmless.
 
 Schopp,
 
 653 So.2d at 1021.
 

 Prosecutorial Comments
 

 Smith contends that his trial was fundamentally flawed by the cumulative effect of prosecutorial misconduct by virtue of allegedly improper comments and arguments made by the prosecutor throughout the trial. Smith also claims that the trial court erred in not granting him a new trial based on this prosecutorial misconduct. While the State acknowledges that Smith objected to these prosecutorial comments at trial, it notes that he never asked the court to consider their cumulative effect in his motion for new trial and only cited two of the comments in that motion.
 

 The standard of review for the denial of a motion for new trial is abuse of discretion.
 
 See Woods v. State,
 
 733 So.2d 980, 988 (Fla.1999). A new trial is only required for prosecutorial misconduct where “it is reasonably evident that the remarks may have influenced the jury to reach a more severe verdict of guilt than it would have otherwise done.”
 
 Thomas v. State,
 
 748 So.2d 970, 984 (Fla.1999);
 
 accord Dufour v. State,
 
 905 So.2d 42, 64 (Fla.2005).
 

 Smith cites six instances of improper comments or arguments by the prosecutors as the basis of this claim. We note that the defense’s objections to all of these comments were sustained by the court, that the defense did not request a curative instruction from the court as to most of the comments, and that only two of the six prosecutorial comments were cited by Smith in his motion for a new trial.
 

 In voir dire questioning of a jury panel, the prosecutor described the case as involving a “drug war” between the members of John Doe and another group and stated that shootings and homicides had occurred between the groups. The court sustained the defense objection to these statements, agreeing with the defense that there was no mention of rival groups in the indictment. Although the court acknowledged that evidence of drug wars and rival groups might come out in the trial, the court ruled that it was inappropriate for the State to discuss this with the jurors at this point. The court denied the defense motion for a mistrial. The court also denied the defense’s motion the following morning to strike the entire panel.
 

 Despite the court’s ruling that it was improper for the State to describe the circumstances of the case as involving drug wars, the indictment actually uses similar terms. In two of the conspiracy counts, the indictment describes Dominique Johnson as a “rival drug dealer” who was shot and killed by Smith and states that Marlon Beneby was shot “over a dispute concern
 
 *508
 
 ing the profits from drug sales.” In describing the John Doe enterprise, the indictment states that the enterprise “used violence and threats of violence ... to retaliate against rival drug organizations.” Thus, the prosecutor’s characterization of the facts of the case was not improper.
 

 Furthermore, the evidence presented at trial clearly established that John Doe engaged in “drug wars” with rival groups. As noted in the sentencing order, several witnesses described the relationship between Fail and Smith as a war and Angel Wilson as an innocent victim of that war. Several witnesses also described the group “going to war” with rival groups. Thus, even if the prosecutor’s comments were improper, there was no prejudice to Smith based on the extensive evidence that confirmed the prosecutor’s description of the crimes.
 

 During the State’s opening statement, the prosecutor described a series of “rules” purportedly established and enforced by Smith.
 
 [11]
 
 The court sustained the defense’s objection to these comments. However, the defense never asked for any other relief based on this comment, such as a curative instruction or a mistrial. The trial court properly sustained the objection to the comment and Smith received all of the relief that he requested.
 

 During direct examination by the State, Detective Alphonso testified about the execution of a number of search warrants on the residences of John Doe members, including the November 1998 search of the home of Smith’s sister Todra and her husband William Austin, who was a tableman for John Doe. In addition to drugs, drug paraphernalia, weapons, and ammunition, the search produced a clipping about Cynthia Brown’s murder from a July 1997 newspaper. Detective Alphonso testified that it appeared that someone had saved the clipping. The court did not allow the State to admit the clipping into evidence, ruling that its probative value was outweighed by its prejudicial effect. The prosecutor characterized the clipping as a “souvenir in the kitchen.” The court sustained the defense’s objection to this comment, but denied its motion for a mistrial. However, at the defense’s request, the court instructed the jury to disregard the word souvenir. This prosecutorial comment was not included as a basis for the defense’s motion for a new trial.
 

 The hypothetical question to the medical examiner was fully discussed above. As noted in that analysis, the State did not repeatedly ask a question that the court had ruled improper. The court had ruled on the form of the question; it did not rule that the question could not be asked. Thus, there was no improper prosecutorial conduct relating to this question.
 

 Smith does not specify what “numerous” improper comments the prosecutor made during closing argument, citing only that the prosecutor improperly vouched for the lead investigator in the Brown murder.
 
 [12]
 
 Thus, it is impossible to
 
 *509
 
 determine if there is any merit to this part of Smith’s claim. Furthermore, the courts of this state allow attorneys wide latitude to argue to the jury during closing argument.
 
 See Thomas v. State,
 
 748 So.2d 970, 984 (Fla.1999);
 
 Breedlove v. State,
 
 413 So.2d 1, 8 (Fla.1982). Logical inferences may be drawn, and counsel is allowed to advance all legitimate arguments.
 
 See Thomas,
 
 748 So.2d at 984;
 
 Breedlove,
 
 413 So.2d at 8.
 

 Finally, Smith cites to the guilt phase closing argument when the prosecutor argued that “nobody knows better, who killed Leon Hadley, than Mr. Smith.” The trial court sustained the defense’s objection that this was an improper comment on Smith’s right to remain silent. However, the jury was instructed that it could not consider Smith’s decision not to testify.
 
 [13]
 
 Because the trial court recognized the error, sustained the defense’s objection, and gave a curative instruction, we review this claim by determining whether the trial court abused its discretion by denying a mistrial.
 
 See Goodwin v. State,
 
 751 So.2d 537, 547 (Fla.1999). A motion for mistrial “should be granted only when it is necessary to ensure that the defendant receives a fair trial.”
 
 Cole v. State,
 
 701 So.2d 845, 853 (Fla.1997). This isolated comment “was not so prejudicial as to require reversal.”
 
 Id.
 

 Smith argues that the trial court erred in not granting a new trial based on the cumulative effect of improper prosecutorial comments during his trial. However, as noted above, most of the comments that Smith complains about were not improper. The improper comments were isolated and did not involve the type of egregious comments that would require a new trial. Moreover, the court reduced any prejudice from these comments by sustaining the defense’s objections and instructing the jury to disregard the comments.
 
 See Thomas,
 
 748 So.2d at 984. Finally, Smith only cited two of these comments as a basis for a new trial, the drug wars comment and the hypothetical question to the medical examiner. There is no merit to the hypothetical question claim, and the drug wars comment alone did not warrant a new trial. Thus, the trial court did not abuse its discretion in denying the motion for a new trial based on prosecutorial misconduct because these remarks would not “have influenced the jury to reach a more severe verdict of guilt than it would have otherwise done.”
 
 Thomas,
 
 748 So.2d at 984. Thus, Smith was not entitled to a new trial on this basis.
 

 Sufficiency of the Evidence
 

 Smith has not challenged the sufficiency of the evidence, but this Court has a mandatory obligation to review the sufficiency of the evidence in every case in which a sentence of death has been imposed.
 
 See Jones v. State,
 
 963 So.2d 180, 184 (Fla.2007); Fla. R.App. P. 9.142(a)(6) (“In death penalty cases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate relief.”). “In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the
 
 *510
 
 elements of the crime beyond a reasonable doubt.”
 
 Simmons v. State,
 
 934 So.2d 1100, 1111 (Fla.2006) (quoting
 
 Bradley v. State,
 
 787 So.2d 732, 738 (Fla.2001)).
 

 We conclude that the record contains competent, substantial evidence to support Smith’s convictions for the first-degree murders of Brown and Wilson. The State presented evidence that Smith solicited the murder of Brown in order to eliminate her as witness against him in another murder case and that Smith admitted his involvement in numerous statements after Brown’s murder. The State also presented evidence that Brown died from asphyxia caused by being smothered with the bed pillow and did not die from a drug overdose.
 

 The State also presented evidence that Smith ordered his subordinates to kill Anthony Fail because he was robbing Smith’s drug holes, that there was an earlier unsuccessful attempt to shoot Fail, and that Wilson was shot by accident in a second attempt to kill Fail. Multiple bullets were fired at Wilson’s vehicle from another vehicle that sped away from the scene. Wilson died from numerous gunshot wounds that caused massive trauma to her body.
 

 Based on a review of the evidence presented in this case, a “rational trier of fact could have found the existence of the elements of the crime[s] beyond a reasonable doubt.”
 
 Simmons,
 
 934 So.2d at 1111 (quoting
 
 Bradley,
 
 787 So.2d at 738). Thus, there was sufficient evidence to support Smith’s convictions.
 

 Proportionality of Death Sentence
 

 Although not argued by Smith, the State asserts that the death sentence is proportional in this case. This Court has explained that “a proportionality review is inherent in this Court’s direct appellate review and the issue is considered regardless of whether it is discussed in the opinion or raised by a party.”
 
 Patton v. State,
 
 878 So.2d 368, 380 (Fla.2004). The Court has described its “proportionality review” as involving “a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances.”
 
 Porter v. State,
 
 564 So.2d 1060, 1064 (Fla.1990);
 
 accord Tillman v. State,
 
 591 So.2d 167, 169 (Fla.1991). Instead, this Court must look to the nature of and the weight given to the aggravating and mitigating circumstances. For purposes of proportionality review, this Court accepts the jury’s recommendation and the trial judge’s weighing of the aggravating and mitigating evidence.
 
 See Bates v. State,
 
 750 So.2d 6, 12 (Fla.1999).
 

 Here, the jury recommended the death sentence for the murders of Angel Wilson and Cynthia Brown. The trial court found three aggravating circumstances in the Brown murder: prior violent felony convictions, that the murder was committed to disrupt the lawful exercise of a government function, and CCP, all of which were given great weight. The trial court found three statutory mitigating factors (lack of significant history of prior criminal activity, extreme disturbance, and the age of the defendant at the time of the murder), which were given little weight. The trial court also considered a number of nonstat-utory mitigating factors, which were given little weight, except for Smith’s good family relationships, which were given some weight.
 

 In the Wilson murder, the trial court found three aggravating factors: prior violent felony convictions, pecuniary gain, and CCP, all of which were given great weight. The trial court found the same three statutory mitigators as in Brown’s murder and
 
 *511
 
 assigned them little weight. The trial court also found the same nonstatutory mitigators as in Brown’s murder and gave them the same weight. The trial court also considered the fact that Smith did not actually shoot Wilson and never intended for her to be killed, but gave this little weight in light of the overwhelming evidence that Smith ordered the execution of Fail and Wilson was killed as a result of that plan. In both cases, the trial court found that “the aggravating circumstances clearly and convincingly outweigh the mitigating factors” and imposed death sentences for both murders.
 

 The State cites three cases to support its argument that the death sentence is proportionate in this case. However, the State notes that the facts of the instant case are so outrageous that is difficult to find a factually comparable case. In
 
 Johnson v. State,
 
 696 So.2d 317 (Fla.1997), this Court affirmed a death sentence for a defendant who orchestrated and participated in the murder of a victim who was targeted for his antidrug efforts in the community. In
 
 Koon v. State,
 
 513 So.2d 1253 (Fla.1987), and
 
 Lara v. State,
 
 464 So.2d 1173 (Fla.1985), this Court affirmed death sentences in witness elimination murders.
 
 Lava
 
 involved the same three aggravating circumstances as the instant case. However,
 
 Lara
 
 involved no mitigating factors.
 

 In the instant case, not only was Smith convicted of murdering Brown and Wilson, for which he received death sentences, but also was convicted of murdering Hadley and Pope, for which he received life sentences. Furthermore, Smith’s motivation for the violence and murders was to safeguard his lucrative drug enterprise. The two women who were the victims for which Smith was sentenced to death were not involved in the drug business. One was trying to “do the right thing” by testifying about the shooting of another man over a money dispute. The other was on her way home to avoid drug-related violence that had been threatened and was brutally murdered because her boyfriend was “at war” with Smith. Under the facts of this case, we find the death sentences to be proportionate.
 

 CONCLUSION
 

 For the reasons expressed above, we find no merit to most of Smith’s claims of error. In those instances where error did occur, we conclude that the error was harmless beyond a reasonable doubt. Accordingly, we affirm Smith’s convictions of first-degree murder and his sentences of death.
 

 It is so ordered.
 

 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, and LABARGA, JJ., concur.
 

 [1]
 

 . In addition to the state indictment, members of the John Doe organization were also charged with federal crimes. Smith was convicted on federal RICO charges, various drug-related charges, and federal firearms violations.
 

 [2]
 

 . The car wash was die "hang out” for members of John Doe and did not actually operate as a car wash.
 

 [3]
 

 . Harvey did not know the real name of this individual.
 

 [4]
 

 .
 
 Williams v. State,
 
 110 So.2d 654 (Fla.1959).
 

 [5]
 

 .
 
 Spencer v. State,
 
 615 So.2d 688 (Fla.1993).
 

 [6]
 

 . The sentencing order noted that Smith had been convicted by the same jury of thirteen other felonies, including multiple counts of murder, manslaughter, and conspiracy. The order stated that "[t]here is no evidence presented to establish [the extreme mental or emotional disturbance] mitigator.” Moreover, the evidence presented actually refuted this mitigator. Finally, the order noted that there was no evidence presented that Smith's age (mid-twenties) had any impact on his thought, actions, or motivations. Thus, the court concluded that “this mitigator [did not carry] any significance beyond the mere fact of [Smith’s] chronological age.”
 

 [7]
 

 . The nonstatutory mitigation included that Smith was raised in a crime infested neighborhood and a gang-controlled community; was a good family man; exhibited good behavior during trial; was exposed to chronic violence while growing up; and graduated from high school.
 

 [8]
 

 . A forensic biologist from the Miami-Dade Police Forensic Crime Lab testified that the rape kit from Brown showed no semen.
 

 [9]
 

 . Slattery testified during the penalty phase that he had conducted the later interviews with Roundtree at the request of the City of Miami Police Department because they were concerned that they had convicted the wrong person for Hadley's murder. During his penalty phase testimony, Detective Alphonso testified that during the investigation of the John Doe organization for the federal case, he learned through interviews that Roundtree might be innocent of Hadley’s murder. Around the same time, Detective Alphonso
 
 *503
 
 learned that the sole eyewitness against Roundtree in the Hadley case had recanted her testimony as to Roundtree's guilt. Had-ley’s first-degree murder conviction for Had-ley’s killing was vacated pursuant to a post-conviction motion on December 20, 2004. Roundtree plead guilty to conspiracy to commit Hadley’s murder and was sentenced to nine years with credit for the time he had served. Roundtree was released from prison in December 2004.
 

 [10]
 

 .
 
 Richardson v. State,
 
 246 So.2d 771 (Fla.1971).
 

 [11]
 

 . The prosecutor made the following statement: "If you compete with me you will be killed. If you steal from me you will be killed. And above all, if you snitch on me you will be killed.”
 

 [12]
 

 . At one point the prosecutor stated that if law enforcement wanted to frame Smith for Brown’s murder, they could have done a better job and built a more persuasive case. Although the court sustained the defense objection to these comments, the comments were in direct response to the defense’s closing argument that the medical examiner and the toxicologist in Brown’s case had given in to pressure from law enforcement to conclude that Brown was murdered rather than to find her death was accidental. Thus, the prosecutor did not improperly "vouch” for law enforcement, but was instead responding to the
 
 *509
 
 defense’s claims that Smith was framed by law enforcement.
 

 [13]
 

 . The court instructed the jury:
 

 The defendant exercised a fundamental right by choosing not to be a witness in his case. You must not view this as an admission of guilt or be influenced in any way by his decision. No juror should ever be concerned that the defendant did or did not take the witness stand to give testimony in this case.